FILED

2022 FEB -3 AM 11: 01

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
RIVERSIDE

BY _____

FEE PAID

1 Name: ANDRES R. RUIZ
2 Address: 2560 OVERLOOK DR.
3 BELTON, TX 76513
4 Phone: 760-989-5809
5 Fax:
6 In Pro Per
7

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ANDRES R. RUIZ

CASE NUMBER: EDCV22-00219-JGB(SPx)

Plaintiff

To be supplied by the Clerk of
The United States District Court

v.

UNITED STATES OF AMERICA

COMPLAINT FOR DAMAGES:
PERSONAL INJURIES BASED ON
MEDICAL NEGLIGENCE

Defendant(s).

COMES NOW, Plantiff ANDRES R. RUIZ, by and through counsel, and states as follows:

1. This court has original jurisdiction under 28 U.S.C. 1346(b) because Plaintiff's claim is a Federal Tort Claim pursuant to 28 U.S.C. 2401(b), and 2671-2680.

2. On or about September 21, 2020, Plaintiff submitted an administrative tort claim to the U.S. Department of Veterans Affairs ("Department"), as required by 28 U.S.C. 2401(b) and 2671-2680. On October 30, 2020, the Department notified Plaintiff they received his tort claim on October 16, 2020, and had six (6) months to consider claim before he could file suit in Federal District Court.

3. Plaintiff was contacted on June 25, 2021, by JANET BARNES, a Department legal representative handling the Federal Tort Claim, sixty days (60) past the six (6) month window the Department had to consider claim.

4. Plaintiff presented his claim to the Department within two (2) years of the date injury arose, and he has exhausted his administrative remedies as required by 28 U.S.C. 2675(a).

5. Plaintiff's claim is based on allegations of preventable and inexusable medical negligence from July 18, 2019, and August 26, 2019 at the Jerry L. Pettis Loma Linda Veterans Hospital.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. 1402 (b) and 32 CFR 750.32 because it is where the Defendant's negligence occurred.

7. Plaintiff Andres R. Ruiz was honorably discharged from the United States Army in September 2003, and also served one tour in combat for the attacks on September 11, 2001. He receives care at Jerry L. Pettis Loma Linda Veterans Hospital for his multiple injuries and illnesses from time in service.

8. On July 18, 2019, Plaintiff had a biopsy procedure performed on the right side of his neck, below his right ear at the Ear, Nose, & Throat Department (ENT). He was informed that the reason for this procedure was to rule out what was assumed to be lymphoma, a deadly type of cancer. Plaintiff became unconscious during biopsy procedure, and regained consciousness after about half a minute. Doctor was tending to him and ensured Plaintiff remained in place until he recovered from traumatic experience. Department received biopsy results and determined surgery was necessary to remove lymph-node to be certain Plaintiff did not have "assumed" lymphoma.

9. On August 26, 2019, Plaintiff arrived to Jerry L. Pettis Loma Linda Veterans Hospital for surgery. During preparation for surgery in Pre-Op room, Plaintiff unexpectedly became unconscious and experienced a "code-blue" incident. Moments leading to incident, Plaintiff was conversing with registered nurse and ex-wife. Ex-wife states that Plaintiff was sitting up conversing, when his head tilted back and Plaintiff began to have a seizure. The equipment that Plaintiff was connected to displayed a flat-line with a steady continuous beep-noise. Ex-wife states that Plaintiff was extremely pale and his body was lifeless and not breathing. She states that at that moment the registered nurse pushed the "code-blue" button on the wall and many doctors and nurses rushed into the room. They also brought the defibrillator device, to shock the Plaintiff's heart if necessary.

10. Ex-wife recalls medical staff turning on the defibrillator device, and suddenly Plaintiff began breathing and became conscious. Plaintiff recalls hearing a voice saying, "Hey buddy, hey buddy, come one breathe breathe breathe. It's okay come on breath buddy breathe." Plaintiff then felt tapping on the side of his face and as he opened his eyes, he noticed a male nurse standing over him. Plaintiff recalls asking the male nurse, "How long was I gone, a few years?" and the male nurse replied, "No, about a minute or so. You weren't breathing." Plaintiff then turned his head to his left and noticed the defibrillator device and asked male nurse, "Did you guys use that thing?" and male nurse replied, "No, we literally turned it on and were about to, but you started breathing and then woke up." Plaintiff was concerned after this incident on whether or not the surgery should proceed. Plaintiff stated to the registered nurse who was prepping him for surgery, "I'm not a rocket scientist, but should surgery even continue?" The registered nurse replied, "I will advise the surgeon and they will make the decision." Plaintiff's now ex-wife was in the room and witnessed the entire incident.

11. The Department made the decision to proceed with surgery, lymph-node was removed, and Plaintiff was taken to recovery room. When Plaintiff awoke from anesthesia, he noticed the same registered nurse sitting with a computer monitor at his feet monitoring his vitals, and his ex-wife sitting to his left. Not once, did they conduct an evaluation after surgery of Plaintiff's limbs to confirm mobility. Plaintiff and his now ex-wife were never informed of any risks involving losing any type of mobility leading up to the surgery, or after the surgery, other than general anesthesia risks. The Department informed Plaintiff that they would be contacting him to follow-up with him during recovery and to also schedule physical therapy. Plaintiff was released from hospital and was taken home by ex-wife and believed that not having any mobility in his right arm was all part of the "recovery process" from the surgical procedure.

12. After about two (2) weeks, the Plaintiff contacted the ENT Department extremely concerned about his right arm because no one had contacted him to schedule therapy. Plaintiff was unable to lift arm or have any of his natural movements. His arm was "frozen" to his right side, with his right shoulder area hunching forward. The Department then assured the Plaintiff that someone would contact him as soon as possible to get therapy scheduled. It never happened.

13. During the next several weeks, Plaintiff sent several emails to the doctor who performed the surgery because of concerns about his arm condition post surgery and lack of contact from the ENT Department. Several more weeks passed and still no contact from anyone at the Department. Plaintiff continued calling and leaving voicemails until he was able to make contact with a Department representative. Department again assured Plaintiff that someone would contact him in a timely fashion to further address his concerns about his arm condition and physical therapy appointments. Unfortunately, again this never happened.

14. In October 2019, the surgical doctor made phone contact with Plaintiff expressing his apologies for what happened. He stated "Sorry, this wasn't supposed to happen. I am very sorry." The doctor made this statement repeatedly during the phone conversation, on top of discussing other things with Plaintiff about scheduling physical therapy for him and so forth. Plaintiff asked, "Am I going to get my arm movement back doctor?" I need my arm for work and other things, I can no longer do any normal activities because of this. I can't do my job, house chores, or play sports, or any of that. I need help for all that stuff now. Do you have any idea how this has affected me physically, mentally, and emotionally? No one has made an effort to contact me for physical therapy, even after I called multiple times to inform you guys of my concern for my arm. Plus, I am in pain every single day. Do you know how that feels doctor?" The doctor once again replied, "I am very sorry for this. I'll see what I can do and will do my best to help you." Doctor finally approved Plaintiff for VA Community Care and Plaintiff started receiving arm therapy at a local clinic near his home. About sixty (60) days had passed since surgery took place when Plaintiff was approved for physical therapy. The nature and severity of surgical injury to Plaintiff's arm was not fully known at this time.

15. From October 2019-May 2020, doctors at VA Community Care Clinic (AVID Physical Therapy) were concerned something major happened during surgery because Plaintiff's arm was not improving. This was not normal in their evaluation and treatment of Plaintiff. They stated that a nerve may have been damaged because of how badly restricted his arm was, to include the pain he was feeling daily. They advised Plaintiff to continue taking prescribed pain medication as prescribed to help him cope with pain, and to continue following up with the Department on this matter.

16. On January 7, 2020 Plaintiff was referred to neurology for an EMG procedure to conduct a nerve study on his right upper extremity. It was confirmed that Plaintiff's spinal accessory nerve was severed, and Plaintiff was diagnosed with muscle atrophy in several muscle groups of his upper right extremities, due to severed nerve from surgery on August 26, 2019.

17. On May 17, 2020 Plaintiff experienced a Transient Ischemic Attack ("TIA" stroke) due to the inevitable overwhelming stress because of no longer being able to perform his duties at his employment because of his right arm disability. Plaintiff tried working through this anguish day in and day out, but his body shutdown on him. Plaintiff was hospitalized at Eisenhower Memorial Hospital in Rancho Mirage, CA. Plaintiff's health and overall quality of life deteriorated. Plaintiff lost his marriage because of the stresses disability caused, also his career of seventeen and a half (17.5yrs) years at a public agency, and his health because of the physical, mental, and emotional hardships the arm disability and chronic pain has caused him on a daily basis.

18. On November 4, 2020 due to the ongoing anguish from the events that took place, Plaintiff experienced a cardiac issue that hospitalized him for seven (7) days at Loma Linda University Hospital in Murrieta, CA. He remained hospitalized until November 10, 2020. Plaintiff's sister cared for him for the next several months, and continues to care for him to this present day.

19. As a result, Plaintiff's overall quality of life was negatively and permanently affected. The Department's medical negligence, and mis-diagnosis from the biopsy report that led them to assume Plaintiff had lymphoma, are what led him to trust the Department with his life and go under surgery. Plaintiff has experienced exponential levels of emotional distress. It took Plaintiff several months to regain his strength following his May 17, 2020 and November 4, 2020 hospitalizations. He was embarrassed because he needed to rely on his sister to help him during his recovery process. Plaintiff's Post-traumatic stress disorder ("PTSD"), anxiety, mood swings, and depression were exacerbated and required additional treatments because of the Defendant's medical negligence.

20. As a result of Defendant's medical negligence prior to surgery, during surgery, and post-surgery care, Plaintiff became medically disabled after being evaluated by CalPERS and SSID doctors.

21. Defendant breached a duty of care it owed to the Plaintiff to provide him essential care pre-surgery, during surgery, and post-surgery. The Department failed in all aspects of care that they promote for our nation's veterans.

22. As a direct and proximate result of Defendant's medical negligence, Plaintiff has been hurt and injured in his health, strength and activity, overall quality of life, sustaining permanent injury to his body, and shock and injury to his central nervous system.

23. As a further, direct and proximate result of Defendant's preventable medical negligence, Plaintiff has suffered mental anguish, fright, humiliation, and heightened levels of emotional, physical, and mental trauma.

WHEREFORE, Plaintiff prays for judgment as follows:

1. General Damages according to proof;
2. Special damages according to proof;
3. Costs of suit as followed by law; and
4. Such other and further relief as the Court deems proper.

Respectfully submitted,

DATED: December 5, 2021

Andres R. Ruiz

Plaintiff



**U.S. Department of Veterans Affairs**
Office of General Counsel

Torts Law Group (021)
810 Vermont Avenue, NW
Washington, DC 20420

Telephone: (202) 461-4900

In Reply Refer To: GCL 482604

**Certified Mail #7008 1140 0002 2625 4442**

September 1, 2021

Andres R. Ruiz
13326 Lasselle Street, Apt. 2103
Moreno Valley, CA 92553

Re:   Administrative Tort Claim

Dear Mr. Ruiz:

The Department of Veterans Affairs (VA) has thoroughly investigated the facts and circumstances surrounding your administrative tort claim. Our adjudication of your claim included a review of your medical records, a review of your claim by a medical reviewer in a different part of the country, and interviews of medical personnel.

The Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) and 2671-2680, under which you filed your claim, provides for monetary compensation when a Government employee, acting within the scope of employment, injures another by a negligent or wrongful act or omission. Medical negligence means there was a breach in the standard of care and that breach proximately caused an injury. The standard of care is the level at which similarly qualified medical professionals would have managed the care under the same or similar circumstances.

Our review concluded that there was no negligent or wrongful act on the part of an employee of the Department of Veterans Affairs (VA) acting within the scope of employment that caused you compensable harm. Accordingly, your claim is denied.

If you are dissatisfied with the denial of your claim, you may file suit directly under the FTCA, 28 U.S.C. §§ 1346(b) and 2671-2680. The FTCA provides that when an agency denies an administrative tort claim, the claimant may seek judicial relief in a Federal district court. The claimant must initiate the suit within six months of the mailing of this notice as shown by the date of this denial (28 U.S.C. § 2401(b)). In any lawsuit, the proper party defendant is the United States, not the Department of Veterans Affairs.

Please note that FTCA claims are governed by a combination of Federal and state laws. Some state laws may limit or bar a claim or lawsuit. VA attorneys handling FTCA claims work for the Federal government and cannot provide advice regarding the impact of state laws or state filing requirements.

Sincerely,

Cynthia Hernandez
Deputy Chief Counsel



**Problem: The Most Regressive Law Ever Passed Against Consumers - MICRA**

- In 1975, the California legislature limited the legal rights of patients and their families who were injured or killed by medical negligence in a law called "MICRA."
- At that time, a $250,000 cap was placed on the amount that a harmed patient or their families could recoup for the trauma that they endured, no matter how devastating their resulting injury, even in cases of wrongful death.
- Nearly 50 years later, that cap, the most regressive limit ever inflicted on patients, has NEVER been adjusted for inflation, and is worth less than $50,000 today.
- Imagine that you or your family suffered a debilitating injury as a result of negligence and then having almost no recourse to help with treatment or to rebuild your life!
- Currently, juries are not informed about the existence of a cap on damages, even when they have determined that the harm done far exceeds that limit.
- This cap disproportionately harms low-income patients and people of color who are trapped in an unfair system.
- With no accountability to patients, our current restrictions on consumer rights make our health care system less safe for everyone.
- With insurance industry lobbyists and special interests leading the charge, all efforts to change this unfair law have gone nowhere. That's why we qualified the Fairness for Injured Patients Act for the November 2022 ballot.

**Solution: The Fairness for Injured Patients Act (FIPA)**

- The initiative will finally adjust for inflation the $250,000 cap set in 1975, bringing it up to $1.2 million.
- It gives the power back to judges and jurors who will be able to decide if compensation above the cap is fair in cases of catastrophic injury or death.
- Juries will finally be informed about the existence of a cap.
- Attorneys who file medical negligence lawsuits will be required to file a certificate of merit, and attorneys who file meritless lawsuits alleging medical negligence will pay the doctors' attorney's fees and costs.
- FIPA will reduce health care costs and burdens on our health care system by ensuring that it is the wrongdoers that pay for the mistakes; not victims and their families.
- The initiative will also deter preventable medical injuries that add billions annually to our health care costs.
- By providing more accountability for consumers and patients, our health care system will be safer for all of us.